Christian, J.
This case is before us upon a writ of •error to a judgment of the Circuit court of Frederick county.
The suit was an action of debt upon three bonds executed by George C. Harris, the plaintiff in eri’or, to Gabriel C. Hands, the testator of the defendant in error; one for the sum of $2,500, payable one day after date, ■and bearing date the 10th day of April 1858; one for the sum of $1,100, dated the 30th October 1858, payable one day after date; and the third for the sum of $1,500, payable one day after date, and dated the 26th day of August 1859.
At the iNovember texm of said court, in the year 1869, *748 the defendant set aside the office judgment by a plea of spayment; which was afterwards withdrawn; and leave was given to the defendant to file special pleas within sixty days; and the case was continued. Under the-leave aforesaid to file special pleas within sixty days, the defendant filed the following plea; which he denominates a “special equitable plea of offsets:”
“ And the said defendant saith, that before and at the time of the execution of the single bills in the plaintiff's declaration mentioned, he, the said defendant, did not. owe any money to the said Gabriel C. Harris, and the sole consideration for the execution of the same was as follows : About the day of-, in the year 1866, foqr suits at law were depending and undetermined in this county against this defendant—two by Henry B. Pitzer,. as plaintiff, for damages $500, in one case, and $2,000 in another; both were actions of trespass for acts done by defendant (juring the civil war, in impressing horses and arresting conscripts under special orders to defendant from the proper military authorities of the Confederate army, in which defendant was regularly enrolled and commissioned as lieutenant: the other two cases were similar, brought by Daniel ~Walker and David Miller respectively, for impressments, and claiming heavy damages. Defendant did not regard these claims, or either of them, or any part thereof, as constituting debts or just liabilities on his part; but owing to the unfavorable and unjust constitution of courts and juries at that time, he had good reason to apprehend that they might be enforced under the form of law upon his property; defendant was in fact informed by his counsel that the result was uncertain ; that judgment had been given for plaintiffs in similar cases in Berkeley county, and might be given here. Defendant, about the date above men *749 tioned, conferred with his father, the said Gabriel O. Harris, upon the situation; who advised defendant warmly, to secure his property against these claims. The • plan adopted with this view, was for the defendant to execute to his father the three notes in the plaintiff's declaration mentioned, ante-dated, and in the terms as they now appear, with the understanding distinctly, that they were only to be used and treated as obligations in order to claim priority over said plaintiffs, in case of necessity ; and if unnecessary, were to be handed back to defendant. Said notes were executed and delivered accordingly, and with said understanding between the parties. . And said defendant solemnly avers that no other or further inducement existed for the giving of said notes; and that the plaintiff had full notice of the above stated facts before the institution of this suit. Wherefore, defendant avers that the said Gabriel C. Harris, in his life time, and said plaintiff since his death, were bound to redeliver said note to defendant, because (as he avers,) that afterwards to wit on the-day of-1867, these suits for damages as aforesaid -were all dismissed, and came to nothing before the death of the said Gabriel O. Harris; and according to the understanding aforesaid, they were null and void, not to be used at all and surrendered. And defendant avers that by reason of the failure aforesaid to treat said notes as agreed and understood, he, the defendant, hath sustained damages to a large amount, to wit, the sum of $10,000, a sum over and above the amount of said notes and interest, and ■this he is ready to verify, &c.”
The plaintiff moved to reject the plea, which motion was sustained by the court; and one of the questions, and the main question, presented by the writ of error, is, whether the court erred in rejecting this plea.
*750 ■ I am of opinion that the plea was properly rejected. In the first place it is difficult to conceive how an issue either by general or special replication could be made up, on such a plea; such are the multiform averments in the plea, detailing his acts and doings as an officer in. the Confederate army, and his apprehensions growing out of claims for damages arising out of his acts as such, and the unjust and unfavourable constitution of the; courts and juries, and detailing what his counsel and his father had advised him to do under the circum'stances. I say it is impossible upon such a plea, that there could be presented a certain, direct and single issue for the jury to try; and if there was no other-ground, the form of the plea, presenting as it did, several distinct issues of fact, would have justified the court in rejecting it.
It is insisted by the learned counsel for the appellant, that the plea is a good one, under the statute commonly called the statute of equitable defences; that the plea, alleged a total “failure of consideration,” and also “such rhatter existing before the execution of the bonds sued on, as would entitle the defendant to relief in equity.” The 5th section of chap. 172, relied upon for the introduction of the plea is in these words: “ In action on a contract, the defendant may file a plea alleging any such failure in the consideration of the contract, or fraud in its procurement, &c. * * as would entitle him to recover damages at law from the plaintiff, or the person under whom the plaintiff' claims, or to relief in equity, in whole or in part, against the obligation of the contract; or if the contract be by deed, alleging any such matter existing before its execution, or any such mistake therein, or in the execution thereof, as would entitle him to such relief in equity,” &c.
How, the plea nowhere alléges “fraud in fbe pfocure *751 mentbut it is insisted, it in substance alleges “ failure ° in tbe consideration.”
It has been repeatedly held by this court that the words “failure in the consideration” as used in the statute, refer to contracts originally founded on a valuable consideration, and not to contracts without consideration. Cunningham v. Smith, 10 Gratt. 255; Watkins v s. Hopkins, ex'or, 13 Gratt. 743.
The allegations of the plea, if true, show that the bonds sued upon were originally without consideration. Such a defence cannot be made to a specialty either at common law or under the statute. The seal imports a consideration, and a party cannot avoid his solemn obligation under seal upon the ground of a want of consideration. That enquiry is precluded by the very nature of the instrument. A seal (as is well said in 1 Smith’s Lead. Cases, p. 636,) properly speaking, renders a consideration superfluous, and binds the parties by force of the natural presumption that an instrument executed with so much deliberation and solemnity is founded upon some sufficient cause. Nor can such defence be made under the statute.
The substance of the averments in the plea, is that these bonds were merely voluntary; and the 7th section of ch. 172, declares that “nothing in this chapter shall impair or affect the obligation of a bond or other deed deemed voluntary in law, upon any party thereto or his representative.”
But it is insisted that the plea is a good plea under the statute, because it alleges “ such matter existing before the execution of the bonds as would entitle him to relief in equity against the obligation of these contracts.” Can this proposition be maintained upon principle or authority? The able argument of the learned counsel for the appellee on this point is *752 conclusive and unanswerable, and the authorities with one voice, sustain his views of this branch of the case.
Suppose the defendant had filed his bill in equity containing the same allegations which this plea sets up; and asking the court to interfere aud decree a cancellation and delivery up of these bonds: would he be entertained for a moment in that forum? He would have to come before that court with the averment in substance, that he voluntarily entered into these obligations for the express purpose of defeating certain claimants who had sued him for damages; that he had ante-dated these bonds, which he executed and delivered to his father, for the purpose of giving him a priority over these claimants; and that no other consideration or inducement existed for giving them. His own statement would close the doors of a court of equity against him. He would iu effect be asking the court to interfere, and by its decree relieve him from the consequences of his own fraud. This a court of equity will never do. The authorities speak with one voice on this subject. Even the cases relied upon by the learned counsel for the appellant, settle the doctrine (which he relies upon with much ingenuity and force to sustain another branch of his argument,) that courts of equity will not relieve parties from the consequences of their own fraud; (See 5 Hob. Pract. p. 542, 543, where numerous cases are cited,) but will leave them where they have placed themselves, by their fraudulent contracts.-
Hor would the other averments in his plea, if -made in a bill in equity, aid him in the slightest degree, in securing the interposition of a court of equity. The fact that he apprehended that injustice would be done him, in the suits then pending against him for damages, because, in his opinion, the courts and juries were unfa *753 vorably and ’ unjustly constituted,” ought not and could not have influenced a court of equity in any manner whatever. That court would be bound to presume that no injustice would be perpetrated in regular legal proceedings had in the forum where such courts are pending. Indeed they were pending before the same tribunal, (the Circuit court of Frederick,) to which he tendered his plea. In point of fact, the courts aud juries were not in his language “ unjustly and unfavorably constituted.” The judge who then, and for more than a year afterwards, presided in the tribunal in which the defendant was sued, was Judge Richard Parker, who, for years before the war, aud before the constitution of a military government, had been the honoured and trusted judge of that Circuit, and whose long judicial career had been illustrated by a purity of character and unquestioned ability and learning, securing to him a judicial record of which any judge in this State might well be proud. As to the juries, they were constituted as they had always been and are now. His case was to be tried by an impartial jury oí his own countrymen, and there was no warrant for his apprehension that 'injustice would be done him, either by the court or juries as then constituted. Such an allegation could not be tolerated for a moment, as an additional aid to the interposition of a court of equity. It would be mischievous to the last degree. The result would be, that a party against whom suits were pending for the recovery of debts, or of damages, might justify himself for assigning caoay his property, so as to put it beyond the reach of his creditors or claimants for damages, upon the ground that he apprehended or had suspicion that the judge or .the juries, as constituted, might do him injustice. I repeat that such an allegation could add no force to his claim for the interposition of a court of equity, because that court would be *754 bound to presume tbat no injustice would be perpetrated in regular legal proceedings had against bim in a court of law.
I tbink, therefore, it is clear tbat if tbe defendant bad come into a court of equity, making the same'allegations in bis bill as be has made in bis plea, bis own statement of his case would have effectually closed against bim tbe doors of a court of equity. And it follows tbat be has not alleged “ such matter existing before tbe execution” of tbe bonds sued upon “ as would entitle bim to relief in equity against the obligation of these contracts.” I am, therefore, clearly of opinion tbat tbe plea tendered, is not a good plea under tbe statute.
Is it a good plea at common law? I tbink not. ' I think this is emphatically one of tbe class of cases in which the maxim of tbe common law, “ nemo allegans suam tarpitudinem est audiendus,” applies with full force.
Tbe learned counsel for tbe appellant, in an argument of great ingenuity, seeks to avoid tbe force of this maxim of tbe common law, by bringing tbe case within tbe operation of tbat other maxim, “ In pari delicto potior est conditio defendentis;” and in an able and. learned discussion of tbe subject, insists, tbat tbe rule to be applied to this case is, tbat courts will not lend their aid to one who was particeps fraudis, either to enforce a fraudulent contract or to relieve from its effects after it is executed. He further insists tbat this is an executory contract, and the plaintiff' is here seeking tbe aid of tbe court in compelling its execution, though fraudulent. When applied to a certain class of illegal contracts, tbe argument of tbe learned counsel, and tbe authorities upon which be relies, are conclusive.
There is, however, a marked distinction between contracts which are void ab initio, and those which are void *755 as to third parties, but which the law upon grounds of public policy, makes valid between the parties.
A contract like that in the leading case of Collins v. Blantern, so much relied upon, was one void ab initio; be■cause,in the language of Oh. Justice Wilmot, “it was an agreement to stifle a prosecution for wilful and corrupt perjury; a crime most detrimental to the Commonwealth and “ the wicked consideration alleged in the plea undoubtedly rendered the bond void ab initio, at the ■common law, being a contract to tempt a man to commit a crime.” And so all the cases relied upon by the learned counsel for the appellee, are cases where the contracts were void ab initio, as contracts against public policy, or contracts against public morals, or some positive law, common law or statute law. And it is upon such contracts that the Supreme court of the United States found their decision in the recent case of Hanaver v. Doane, 12 Wall, U. S. R. S42. And in such cases, it is undoubtedly sound law, that where the court, either by the allegations of the plaintiff or by a proper plea of the ■defendant, is informed that the contract sought to be enforced is one which is void, because illegal, it will not lend its aid either to enforce on the one hand or give relief on the other. But in the case before us, the contract was one, which though void as to third parties, is, by the express terms of the statute, (as construed by this court so ■often that it is impossible now that its meaning can be ■questioned,) binding and valid between the parties. This ■statute (Code p. 565, ch. 118, § 1) declares that “every bond or other writing given with intent to delay, hinder or defraud creditors, purchasers or other persons of or from what they are or may be lawfully entitled to, shall as to such creditors, purchasers or other persons, their representatives or assigns, be void.” But such a contract as between the parties has uniformly and by unvarying *756 decisions of this court, been held binding and valid. So- . a that in such a contract as the case before us, it cannot be ■ said that the contract was void ab initio, but it is one which is valid between the parties; and if valid, of course one which the courts will enforce as between the parties, though void as to third parties.
'Whatever may be the conflict of authorities in other St-ates, (and I think there is none when the proper distinction is borne in mind between contraéis void ab initio and contracts void as to third parties, but valid between the-parties,) in Virginia the question must be conceded as res adjudicata.
This case must be ruled by the cases of Starke’s ex’ors v. Littlepage, 4 Rand 368; James v. Bird’s adm’r, 8 Leigh 510; Terrell v. Imboden, 10 Leigh 321; and Sharp & wife v. Owen, 12 Leigh 429. It is impossible to distinguish these eases, in principle, from the case at bar; and if ever there -was a case in which the doctrine of “starede eisis” applies in full force, it is in the case before us.
The case of Starke v. Littlepage, 4 Rand. 368, was an action of detinue brought by the executors of Starkeagainst Littlepage to recover certain slaves in his possession. The verdict and judgment was for the defendant, on a plea of non detinet. The court below admitted evidence to show that Starke’s purchase of certain slaves under execution, was not a real and bona fide purchase,, but one made for the defendant, and with his money, and was intended by both as a cover to protect defendant’s property from executions of other creditors. This court reversed the judgment of the court below, on the ground that such evidence was inadmissible; and although the slaves had been in possession of the defendant for twenty years, he was compelled to deliver them to the plaintiff, under his contract; and the defendant was not permitted to show that the purchase by Starke,. *757 at the sheriff’s sale, was not a real and bona fide purchase, and was made with the money of Littlepage, for the purpose of defeating other execution creditors. And the maxim nemo allegans mam turpitudinem est audiendus was declared to be applicable to the case. Judge Green, delivering the opinion of the majority of the court, says : “In the case of Hawes v. Leader, Cro. James 270, .this point has been decided at law, and has never •since been questioned, but uniformly recognized as good law. In that case the intestate of the defendant granted by deed to the plaintiff all his goods embraced in a schedule, and covenanted to deliver them quietly to the plaintiff. After the death of the grantor, the grantee brought an action of debt against his administrator for the goods mentioned in the schedule. The defendant pleaded that his intestate was lai’gely indebted, specifying the debts, and that the deed was ipade by fraud and •covin between his intestate and the plaintiff, to deceive those creditors; and that his intestate, notwithstanding the deed, used and occupied the goods during his life time. To this plea the plaintiff' demurred, and had judgment upon the merits.” This case of Hawes v. Leader has been repeatedly approved by this court, especially in the last case on the subject, (Owen v. Sharp & $ wife, 12 Leigh 127,) in which Judge Allen, delivering the unanimous opinion of this court, recognizes it as “founded on •sound principles of law and policy.”
Judge Green further says, (and I quote from his opinion again, because his reasoning applies with great force to this case,) it is a general rule that, “in pari ■delicto potior est conditio defendentis,” and this was the pi’inciple of the civil law. But this rule operates only In cases where the refusal of the courts to aid either party, frustrates the object of the transaction and takes away the temptation to engage in contracts contra bonos *758 mores, or violating the policy of the law. If it be necessary in order to discountenance such transactions,, to enforce such a contract at law, or to relieve against it in equity, it will be done though both the parties are in pari delicto. The party is not allowed to allege his own turpitude in such cases, when defendant at law, or prevented from alleging it when plaintiff in equity, whenever the refusal to execute the contract at law, or the refusal to relieve against it in equity, would give effect to the original purpose, and encourage the par ties engaging in such transactions.” After citing several cases to sustain his position, he concludes: “ To allow a fraudulent debtor conveying his property to' another with intent to defraud his creditors to allege that fraud, for the purpose of avoiding the transfer, would be using the maxim of the law to frustrate the policy of that maxim, by giving full effect to the fraudulent contrivance of the parties according to their intent; and indeed rather to enforce than to frustrate-the fraudulent contract; and debtors might with perfect impunity practice frauds upon their creditors.”
The next case decided by this court was that of James v. Bird’s adm’r, 8 Leigh 510. The case was briefly this: Bird, with a view to hinder and defraud his creditors, conveyed his slaves to James, and took his bond for the sum of $8,000 as the price of them. He filed a bill for the recission of the contract, upon the ground that’ it was not a bona ñde sale. The proofs were full as to the fraudulent intent. The court held that the bill ought tohavebeen dismissed. Judge Parker, (withwhom all the judges concurred,) said, referring to the case of Starke’s ex’ors v. Littlepage, “ If James had sued at laxo to recover’ the slaves. included in the deed, Bird would not have been allowed to defeat his claim by proving the fraud; and so too, if Bird brings his action (on the $8,000 bond,) *759 to recover the purchase money to which there seems to be no impediment, the fraudulent grantee would not be permitted to impeach the transaction, and could set up other than a strictly legal defence.” The case before us is brought exactly within the principles of this decision. Bird might have sued at law upon his bond, to which Judge Parker said, “ there was no impediment,” and James could not have pleaded that the transaction was not bona fide, but entered into to defraud other creditors. So here there is “ no impediment ” to the plaintiff’s suing upon the bonds, and the defendant cannot be permitted to set up the defence that the bonds were given for the purpose of protecting himself against other claimants suing him in the same court. See also Terrell v. Imboden, 10 Leigh 321; Judge Parker’s opinion, approving Starke v. Littlepage, and James v. Bird’s adm’r, supra, and reiterating the view always entertained by this court, that such a contract as the one under consideration, though void as to creditors, is valid and binding between the parties.
The last case decided by this court, in which the questions we are now considering are discussed, was the case of Owen v. Sharp & wife, 12 Leigh 427. The case was this: Waddy Thompson being at the time much embarrassed with debt, executed a bill of sale of a female slave, absolute on its face, in order to protect the property from his creditors; but with a secret trust that die grantee should hold the property for the benefit of the grantor’s daughters. Sharp having married one of the daughters, Sharp and wife filed their hill, setting up the secret trust; and that being proved, the Circuit court decreed the slaves and their increase to the daughters of Thompson. That decree was reversed by this court. Judge Allen delivered the opinion of the court; and the first sentences of that opinion show that he consi *760 dered the questions raised in the case before us as res A w adjudicata; and that however harshly the decision must operate upon the appellees in that case, the court was bound by the rule of stare decisis. He says: “With every disposition to deprive the fraudulent donee of the fruits of his iniquity, it seems to me that the repeated decisions of this court, and considerations of public policy, preclude us from giving relief in, this case. A fraudulent conveyance, though void as to creditors, is good between the parties. Being valid between the parties, it follows that the fraudulent grantor cannot be permitted to allege his fraud to avoid his deed. After approving the case of Hawes v. Leader, and the Virginia cases above referred to, he uses the following language, in commenting upon the case of Ward v. Webber, 1 Wash. 274, which had been relied on by the counsel for the appellees in that case: “ They (the plaintiffs in that case,) had an absolute conveyance, and no proof of fraud came from them. It was offered by the defendant. To have received such evidence, would have been to have permitted the party committing the fraud, to have relied on it in his own defence. * * * * In this case, (Owen v. Sharp,) it seems to me the proof of fraud comes, and of necessity must come, from the plaintiffs. The defendant has his deed absolute upon its face, and made apparently for a full and valuable consideration. The plaintiffs are driven to the necessity of showing by parol evidence, that this recital was false, that no consisideration passed; and in doing so, they prove that the money ostensibly paid by the defendant was in fact the money of the grantor; and that this device was resorted to for the purpose of securing the property from his creditors. The deed being absolute, the plaintiffs attempt to execute a secret trust, and in doing so, show the intent with which it was created. If *761 the facts were reversed, if the trust had been expressed on the face of the deed, and the grantee had refused to execute it on the ground of fraud, he would then be compelled to allege his own fraud to protect himself, and could not be heard.” In the conclusion of this able opinion, Judge Allen adds, (showing how firmly the principles announced have been settled), “The conduct of Owen in this transaction has been marked with the most heartless perfidy towards his confiding father-in-law •and his children, and the grossest fraud. But standing in the position he does, it seems to me that the law protects him.”
I have quoted thus largely from the opinion of Judge Allen, because its reasoning and the principles announced, apply with peculiar force to the case under consideration. In this case the very language of Judge Allen, (substituting the word bond for deed,) may be used. The bonds were absolute upon their face. The •seals imported a valuable consideration. hTo proof of fraud came from or was necessary to come from the plaintiff. It was offered by the defendant. To have received such evidence would have permitted the party committing the fraud to rely on it in his own defence. The plaintiff holds the bonds absolute upon their face, and apparently for a full and valuable consideration. The defendant is driven to the necessity of showing, by parol evidence, that no consideration passed; and in doing so he must allege and prove that it was a scheme or device resorted to for the express purpose of securing Ms property from claimants who had brought their suits for damages in the same court in which he offered his plea. In this case the proof of fraud comes, and of necessity must come, from the defendant. The bonds held by the executor being absolute upon their face, for the payment of a sum of money due the testator, “for value received of him,” as expressed on the face of the bonds, *762 the defendant attempts to establish a secret trust; and in doing so must show the intent with which it was created; and so must rely upon his fraud, in his own defence.
I think it is clear that upon the decisions of this court,, the plea tendered by the defendant, presents no legal defence to the plaintiff’s action on the bonds, and that the court below did not err in ejecting the plea. Ear are the decisions of this court at all in contravention of the best considered cases in the other States of the Union, or of the English cases.
In a very learned note of Messrs. Hare and Wallace in Smith’s Leading Oases. Vol. 1st, pt 1st, ed. of 1866, to the Leading Case of Collins v. Blantern, much relied on by the counsel for the appellee, and where all the authorities, English and American, are carefully collected, it is said, p. 637, “ In order, however, to apply the rule potior est conditio defendentis, correctly, it is necessary to consider, not who is plaintiff and who defendant, but by whom the fraud is alleged, or sought to be made a ground of defence or recovery. For although it is no doubt true in general, that the law will not lend its aid to enforce a fraudulent or illegal contract, still if the plaintiff can make out his case without disclosing the fraud, the defendant will not be allowed to show that he is equally guilty with the plaintiff', as a reason why the latter should not recover. An action of debt or ejectment consequently cannot be defeated by proof, that the instrument which constitutes the foundation of the. plaintiff’s claim, was executed with a secret and fraudulent understanding that it should be subject to a trust for the benefit of the defendant, and surrendered whenever he thought proper to demand it.” And for this doctrine the authors cite many cases, English and American.
These doctrines must now be considered as settled too firmly to be shaken. There is but a single case which *763 can be said to be in opposition to tbe views herein expressed, and that when properly understood, has no application to the case. That is the case of “ Austin’s admix v. Winston’s ex’x’’ 1 Hen. and Mun. 33. In the first place it may be said that this case has never been followed. It was a decision of two judges; and its authority has been seriously questioned. In James v. Bird’s adm’r, 8 Leigh 510, already referred to, Judge Parker says: “ There is no ease in equity where relief has been given to a fraudulent grantor of property, the conveyance being made to protect it against his creditors, except that of Austin’s adm'x v. Winston’s ex’x, decided by a divided court, and perhaps under the circumstances, properly decided.” Mr. Conway Eobinson, in his admirable work, in reference to the same ease, says: “ Hot-withstanding Austin’s adm'x v. Winston’s ex’x, the case of Hawes v. Leader, was approved in Starke’s ex’ors v. Littlepage; and such is the general course of decisions;” and in a note to the text he refers to James v. Bird’s adm’r, Terrell v. Imboden and Owen v. Sharp and wife; in all of .which and especially the last, Hawes v. Leader was approved as unquestioned law. 5 Rob. Pract. 543. But conceding that Austin’s adm’x v. Winston’s ex’x, is sound law and its authority unquestioned; still the case before us cannot be brought within the principles of that case. The relief given in that case was founded upon the fact that the grantee, a creditor, (the debtor being in distressed circumstances,) had availed himself of his power over him to induce the debtor to unite in the fraud ; the creditor having proposed and urged the execution of the scheme which was adapted for that purpose. Ho circumstances of that sort are even suggested in the case before us.
It is further argued that there is a distinction between executory and executed contracts; and this being an exee~ *764 utory contract, the court ought to refuse its aid in granting relief to the plaintiff. It is sufficient to say in answer to this position, that no such distinction is recognized in the uniform decisions of this court. But, on the contrary, Hawes v. Leader, so often approved, was a case of executory contract; and in James v. Bird's adm'r it was distinctly said by Judge Parker, that if the suit in that case had been brought on the bond of $8,000 executed as the price of the slaves, James could not have defeated the action by alleging that the bond was not in fact given for the purchase money, but was only intended to defeat the claims of other creditors ; in other words, he “would not be allowed to impeach the transaction, and could set up no other than a strictly legal defence.”
It is, however, urged with much ingenuity and force, that this case does not come within the operation of the statute of frauds; because these bonds were not given to hinder and delay creditors, but only to protect the defendant against the assertion of unjust demands, which he apprehended might be recovered against him because of the “uniavorable and unjust constitution of courts and juries at that time;” that there was no fraudulent intent to secure his property against the claims of creditors; but the scheme resorted to was one intended for protection against unjust claimants. How, it must be conceded that a party claiming damages for the acts of another, must be regarded in law as much the creditor of that other, as one holding his bonds or other promises to pay. Every person having a legal demand against another, is his creditor, whether that demand is one sounding in damages, or one that comes under a contract. This is a proposition too plain for argument. And it is to my mind equally plain, that the question, whether the demand asserted is a just and legal one, and whether *765 the courts and juries will be likely to enforce an illegal and unjust claim, is not one for the party himself to decide. FTor will another court, passing upon his transactions, in transfering his property to- another to protect himself against such demands made in regular legal proceedings, enquire whether his apprehensions were justified, or whether the suits pending against him were proper suits. All these must necessarily be questions which another court cannot enquire into, and which certainly the party cannot be allowed to decide for himself. Much has been said about the abnormal condition of affairs after the close of the late war, and the uncertainty of the administration of justice, growing out of the fact that the State was subjected to a military government which had the power to remove all State officers. But all this, (if it could be taken cognizance of at all in a court of law, upon a plea to an action of debt,) applies to a later period. When these suits were pending against the appellant for damages, in the Circuit court of Frederick, during the year 1866 and part of the year 1867, when they were dismissed, that court was presided over by an able and upright judge, who was not removed till the year 1869; and I think all must admit that during that period there was certainly an honest and impartial administration of justice in this Commonwealth. So that there was nothing in the extraordinary circumstances of the times which can take this case out of the operation of the well settled rules of law.
lam also of opinion, that there was no error in rejecting the special plea of non est factum. That plea admits the execution and delivery of the bonds by the appellant to the appellee’s testator, but avers that they were “ so executed and delivered without any consideration in money or other value, or any debt then due and owing between the parties; but was so made and delivered *766 solely for the use and benefit, and under the control of the said defendant, and to be redelivered to said defendant, by the agreement of the parties at the time, whenever the said defendant should request it. Wherefore, the said defendant says the said writing obligatory is not his deed,” &c.
This cannot be received as a plea of non est factum, because the plea in terms admits the execution and delivery of the bonds, the very thing which the plea of non est factum always puts in issue. Uor is the objection one of form only. The matter averred could not be pleaded in any form. It avers in effect that the bonds were delivered to the obligee, to be redelivered to the obligor whenever he demanded it. A deed executed and delivered, subject to the abrogation of the maker at his pleasure, is something unknown to the law. However much disposed I might be to relieve the appellant under the circumstances, from a harsh judgment, I am compelled to say, in the language of Judge Allen, in Owen v. Sharp, “ He has placed himself in a position where the courts cannot relieve him.”
Hpon the whole case, I am of opinion that, upon well settled principles of law, established by the uniform decisions of this court, there was no error in the judgment of the Circuit court; and that it ought to be affirmed.
Anderson J. Broom says': It is “a general rule that an agreement cannot be made the subject of an action, if it can be impeached on the grounds of dishonesty, or as being opposed to public policy; if it be either contra bonos mores, or forbidden by the law.” Broom’s Legal Maxims, p. 349, side. Ex dolo malo non oritur actio, has been recognized as a maxim of law, wherever organized society has existed. The same writer says, *767 those who come into a court of justice for redress, must come with clean hands, and must disclose a transaction warranted by law. “ Ex maleficio non oritur contractus. J . And this defence may be made by a defendant who is pari delicto. Although it is an indisputable proposition, as against an-innocent party, that no man shall set up his own iniquity as a defence, any more than as a cause of action; and that is what O. J. Mansfield meant in Montefiori v. Montefiori, 1 W. Black. R. 363; yet, where a contract or deed is made for an illegal purpose, whatever may be stated in it, a defendant against whom it is sought to be enforced, may show the turpitude of both himself and the plaintiff'; and a court of justice will not give its aid to enforce a contract springing from such a source. In Holeman v. Johnson, Cowp. R. 341, 343, C. J. Mansfield said, “ the principle of public policy is this: ex dolo malo non oritur actio; bio court will lend its aid to a man who founds his action upon an immoral or illegal act. If from the plaintiff’s own stating, or otherwise, the cause of action appears to arise ex turpi causa, or a transgression of a positive law of this country, then the court says, he has no right to be assisted. * * * So if the plaintiff' and defendant were to change sides, and the defendantwas to bring his action againstthe plaintiff, the latter would then have the advantage of it; for where both are equally in fault, potior est conditio defendentis. In support of this principle, authorities might be cited almost without limit; but I deem it unnecessary. It cannot be controverted successfully without overturning the oldest and best established maxims of the law.
But it is contended, that the acts prohibited by the statute of frauds, to hinder, delay or defraud creditors, &c., do not fall within this principle. Are they not dolo malo ? Are they not against mores bonos ? Are they not dishonest? Bo not contracts or conveyances *768 W^C-*ZI are mac^e 1° hinder, delay and defraud creditors, or other persons of their just and legal demands, arise ex maleficio ? The statute declares that such act3 “as to such creditors, purchasers or other persons, -they, representatives or assigns, shall be void.” It does .not say that they shall or shall not be void, or valid as between the parties themselves. The statute only. makes them void as to the parties who were designed to be injured; and as between the parties themselves does not provide how they shall be treated or regarded. The law on this subject is not declared by the sthtute ; and if such acts were valid and binding as between the parties themselves, at common law, they would-still be so after the statute. But were they ? I cannot but think that it was as dishonest and immoral-for aman to dispose of his property with a secret trust for his own benefit, to defraud his creditors or other persons, of their just and legal demands, before the statute, as since. And I think the better opinion is, that the statute is only declaratory of the common law.] Coke Litt. 290 b. Lord Coke so held. And Lord Mansfield said that the principles of the common law, as now universally known and understood, are so strong against fraud in every shape, that the common law would have attained every end proposed by the statute of Elizabeth c. 5. But the courts-have held that such contracts are binding between the parties themselves. But I am not aware that it has ever-been held that the party who was^art delicto, and who was out of possession, could maintain an- action to enforce the contract, or to acquire the fruits of his fraudulent contrivance, unless it is'so held in Starke’s ex’ors v. Littlepage, 4 Rand. 368. That case was decided by a. minority of the whole court, by two judges in a court of three. I have found no other case in which this court has decided that a fraudulent grantee, who was pari de *769 lido in the fraud, would be aided, either by a court of law or equity, to possess himself of the fruits of his fraudulent contract, or that the fraud might not he shown by the defendant.
The case of Austin’s adm’x v. Winston’s ex'x, 1 Hen. & Mun. 33, was a bill by the executor of the grantor, against the fraudulent grantee, to redeem the slaves which he had obtained from the grantor, under a fraudulent contrivance to shield them from the grantor’s creditors, with a secret trust that they were to be restored to the grantor. Relief was given in that case, to the representative of the grantor, upon the ground that he was not pari delido in the fraud. J. Tucker was of opinion that he was pari delicto, and that his bill ought to be dismissed. He says: “ It is a maxim at law that when the parties are equally culpable or criminal, the defendant must prevail: and in equity, that he that has done iniquity shall not have equity; that is, that he shall not have the aid of the court where he is plaintiff; which brings both maxims to the same point.” And he further says, “that had Austin been the plaintiff, andWinston the defendant, I should have held him as little entitled to the aid of a court, as I now think Winston.” His opinion is put upon the ground that they were equally in fault, and that in such case potior est conditio defendentis. He clearly negatives the idea that by virtue of the statute of frauds, the contract is binding between the fraudulent parties themselves, in the sense that it will he enforced in courts of justice, as between the parties, at the instance of a particeps fraudis. The other judges were for enforcing it, in favor of the fraudulent grantor, but upon the ground that he was not pari delicto, but that there were circumstances palliating and excusing the fraud on the part of the grantor. And, in that case the majority of the court held that the osten *770 sible contract was not binding between the parties under the circumstances, and enforced the secret trust in favour of the grantor, but upon the ground that he was not pari delicto. The majority of the court concurred with J. Tucker in the principles of law, as laid down by him, but differed from him in their application to that case.
In the case before us, I may here remark, if the plaintiff in error had been plaintiff below, and had exhibited his bill in equity against his father’s executor, to compel him to surrender his bonds, in compliance with his father’s agreement, the circumstances, I think, would have presented a much stronger case for relief, than in the case of Austin's adm'x v. Winston's ex'x. But, in this case, the plaintiff in error was defendant; and it was a plain case for the application of the principles, as laid down by J. Tucker in Austin v. Winston, and concurred in by all the judges, and controverted by no other decision of this court, that I am aware of, except in Starke's ex'ors v. Littlepage, supra. The subsequent cases of James v. Bird's adm'r; Terrell v. Imboden & others; and Owen v. Sharp & wife; cited and relied on by the counsel for defendant, are not in conflict with the principles declared in the commencement of this opinion, and as laid down by J. Tucker in Austin v. Winston, and concurred in by the whole court. In all of those cases relief was denied the plaintiff, who sought relief from the contract made to defraud creditors, and for the enforcement of the secret trust in his favor. If the contract is binding between the parties themselves, the courts will leave them where they have placed themselves, and will not open its doors for either of them to enter, to obtain its aid to carry out the fraudulent contract. The antienprinciple of equity, that a court of equity will not stain its escutcheon by aiding a party in carrying out a fraud; *771 or that other great legal maxim that in pari delicto potior .est conditio defendentis, has not been overturned or assailed by either of those decisions. And the case of Starke’s ex’ors v. Littlepage, decided by a minority of the whole court, and therefore not authority, has not been followed in subsequent cases; and whether right or wrong in principle, has not been established as authority. And if the transaction in this case was fraudulent, the father was at least in pari delicto with the son; and the judgment of the court below, in repudiating the long established maxim, that a right of action cannot arise out of fraud; and also that other equally well established maxim, that when the plaintiff and defendant are in pari delicto, the defendant should prevail, is erroneous.
In this view I am fully sustained by the Supreme court of Kentucky, in Norris v. Norris’ adm’r 9 Dana, R. 317. That was an action of covenant. The opinion of the court was delivered by the able and distinguished Chief J. Robertson, and maintains that “when the parties to an illegal or fraudulent contract are in pari decido, neither a court of equity nor a court of law will aid •either of them in enforcing the execution of that which may be executory, or in revoking or rescinding that which may be executed. In such a case, the law will not be the instrument of its own subversion. And to every invocation -of its assistance, replies, in pari delicto, potior est conditio defendentis.” Again: “ Our statute against frauds, which declares that all conveyances, bonds, etc., made for the illegal purpose of defrauding bona fide creditors or purchasers, shall be void only as to any such creditor or purchaser, has never been construed -as ‘having been intended to change the conservative principle just defined. * * * And, therefore, a party to an executory agreement made to defraud creditors or *772 purchasers, has no more right to maintain a suit for co~ erc*n& ^ie execution of it, than a party to an executed for the same illegal end would have to prosecute a suit for restoration or recission.” The same distinction is maintained in Mason & wife v. Baker 1 A. K. Marsh. R. 208, marg. p. 153, top. Chief J. Boyle,, delivering the opinion of the court, says: “It is true that the bill of sale, though fraudulent as to creditors and purchasers, is nevertheless binding in law upon the parties to it; and that a court of equity would not interfere in behalf of Baker (the grantor) to set it aside. But. it is equally true, that a court of equity cannot, according to the principles by which it is invariably governed,, lend its aid to’ give effect to the bill of sale. Bor Hamlett, (the grantee,) as well as Baker, is partieeps criminis,. and equally guilty of the fraud. And the rule is, that in respect to the parties to the fraud, in pari delicto potior est conditio defendentis.” Fargo v. Ladd, 6 Wis. R. 106, is in accord.
The principle of these cases is, that although the statute is construed to avoid the contract only as to those-whom it was designed to defraud, and to consider it binding between the parties themselves, the courts will not interfere to set it aside, or to enforce it, but will leave the parties where they have placed themselves. There-is nothing in the opinion of J. Allen, in Owen v. Sharp & al., supra, in conflict with this principle. He holds, indeed, under the established judicial construction of the statute, the contract is binding between the parties themselves, and that the court could not entertain the plaintiffs, who claimed under the fraudulent grantor, to rescind it, although the perfidious and iniquitous conduct of the fraudulent grantee would strongly incline it to do so. "Who can doubt that if the case had been reversed, and the fraudulent grantee had been suing to enforce *773 the contract, that the court would, with alacrity, have dismissed him from its portals. The perusal of J. Allen’s opinion can leave no question of this on the mind. And that is precisely the case here. The fraudulent obligee is seeking the assistance of the court to enforce his fraudulent contract against his son, in which he is more to blame than the son. For, doubtless, the son consented to the arrangement under his parental influence. The character of the transaction is made known to the court by the plea; the facts of which, on a motion to reject, as upon a demuner, must be taken as true. And now this father invokes the assistance of the court, in violation of his faith to his son, (or his personal representative does it, which is the same thing,) to enforce this fraudulent contract in his behalf, and to helps him to the fruits of his fraud, and thereby enable him to practice a most iniquitous fraud upon his son. To entertain him for such a purpose, it seems to me, would bring reproach upon the courts, and the administration of public justice. It cannot be the public policy requires that the equally culpable, in this case, the most culpable party, should be rewarded, by the direct instrumentality and agency of the courts of justice, with the fruits of his fraud, in order to punish the other party, and to deter others from such practices: This act most probably would never have been committed by the son except by the influence and advice of the father; and to reward him for it, would encourage its repetition, which is certainly against public policy.
But I rest my opinion in this case also upon another ground. The plaintiff in error was guilty of no fraud in the transaction as set out in his special plea, either at common law,, or under the statute. His case does not fall within the purview of the statute of frauds. The language of the 1st section is (Code of 60, Chap. 118, *774 p. 565,) “every gift, conveyance,” &c., and “ every bond _ .. . or other writing, given, with intent to delay, hinder or defraud creditors, purchasers or other persons, of or yrom whai {fay or may be laiofully entitled to, shall,, as to such creditors, purchasers or other persons, their representatives or assigns, be void.” These bonds were not given to defraud any persons “ of or from luhat they were laiofully entitled to.” The facts as shown by the-plea, are, that the plaintiff in error was an officer in the military service of the Confederate States in the late war, and that four suits had been instituted against him for heavy damages by parties claiming to-have been loyal citizens of the United States, for acts done by him in his official character, in obedience to the orders of his superiors in command during the war And that he was greatly alarmed, and seriously apprehended, that owing to the bitter hostility which swayed the then supreme power in the country, towards the class* to which he belonged, that the plaintiffs would .succeed,, in the then unsettled condition of the country, without a constitutional and stable government, in recovering their unjust demands against him; which would overwhelm . him with ruin. That he sought advice from his counsel, who gave him no ground for hope or encouragement. That he then sought counsel from his father, who increased his alarm, and urged him to do something to protect him from the impending catastrophe; and as the result of that conference, he executed the bonds upon which this suit was brought, and placed them in the hands of his father, to have the force of bonds, only in the event that the plaintiffs recovered against him, in said suits; and that if they did not recover, then the said bonds were to have no force or effect; but were to be delivered up to him by his father. And he avers that said suits were afterwards abandoned, and dismissed *775 by the plaintiffs, and Ms father died, without returning to him his said bonds, and they afterwards coming to the possession of his executor, the defendant in error, he instituted this suit upon them. It is evident from the pleadings, that the papers in controversy, were signed and sealed by the plaintiff in error, and handed to Ms father by his advice, for his protection, in the event there was a recovery against him, in the suits aforesaid. It was designed, however vain and ineffectual the device, to screen his property from any recovery that might be had against him in those suits, and for no other purpose whatever. It was not intended to protect his property from the claims of creditors or other persons, of what they ioere or might be lawfully entitled to, because the bonds were handed to his father, with the express condition, that they were to be returned to him in the event that there was no recovery against him in those suits. If there was any intent to delay, hinder or defraud any body, it was only the plaintiffs in those suits.
"Was the execution of these bonds, for the purpose of rendering a recovery in these suits unavailing, fraudulent in intent? They clearly had no lawful or just claim against him for damages for the execution of the orders of his superiors’. It was his duty to obey their orders; and they had the power to enforce obedience. They had, therefore, no just or lawful demand against him. And a recovery against him, would be repulsive, not only to the well established principles of law, but to the plainest dictates of morality and justice, which they virtually acknowledged themselves, by abandoning and dismissing their suits. Yet, without any constitutional protection, and with a sense of the insecurity of all personal and civil rights, under military rule, and not knowing how the courts which would have the trial of those suits, might he constituted under the military bills, *776 w^ck ^een ena°te¿ by Congress, which placed the civil authority under the foot of the mili- ■ tary, he entered into this arrangement with his father, and by his advice, to save himself and family from destitution and ruin, should such an iniquity be perpetrated against him, as he apprehended, and had just cause to apprehend, might be done, in the then prevailing temper of those who wielded the power. There might have been no necessity for it, as the result showed there was not. But in that case, no harm would be done to any one; and no harm would have been done, if the father had kept his iaith with his son, and returned him his bonds. Neither creditors nor purchasers, nor other persons including the plaintiff’s in. those suits, suffered any loss by this arrangement between the father and the son. Nor does it seem to me that it was fraudulent in intent, because designed to render any recovery in the suits which had been instituted against him, unavailing.
Actual fraud cannot exist where there was no fraudulent intent. And there can be no fraudulent intent unless injury is intended to the rights of others. And no injury can be done to other’s rights, when none existed. Now the plaintiff in error, by this arrangement with his father, however unwise or injudicious, has done no injury to any body. The plaintiffs in those suits have acknowledged they had no rights, by abandoning them. And the execution of the bonds in question, has not affected them in any way; and could not have affected them unless they had succeeded by unlawful authority, by might and not by right, in recovering judgments against him. In that case the bonds, if they could have been made availing to the obligor, would only have protected his property against a wrongful invasion of his rights by .lawless power. The act was not done to protect his *777 property against a rightful and constitutional adminisftration of the law; from that he had nothing to fear. Hut it was only designed to operate against an ular and unconstitutional administration of the law. It is said that a pure and able judge presided in the «court where those suits were brought; but what assurance was there that he would continue to preside there under the military bills enacted by Congress, «until those suits were tried. He was then a judge «only at sufferance, and might be removed any day, as he was soon after, by the fiat of a shoulder strapped despot; an issue, which, I think, the plaintiff had cause to apprehend, in the circumstances which surrounded him. His apprehensions, though by no means groundless, were not realized, and the writings he executed were not to operate if they were not realized. His design was not to invade the rights of others, but only to protect his own. If his apprehensions -were groundless, no harm was done; if they were real no wrong was done. It was only against apprehended wrong that he sought to protect himself, under circumstances most extraordinary and anomalous. It is true that in his attempt, he resorted to deception, How his conduct might be regarded in the code of morals, it is needless to inquire. Hut if there is such a thing as dolus bonus ; if a person would be justified by finesse and deception to shield his property from a lawless robber, he, by this contrivance, is liable to no greater censure.
I know of no principle which would forbid the interference of a court of equity, if this suit had been brought by the father in his life time, to restrain him from perpetrating so great a wrong upon his son, in violation of the plainest principles of right and honesty. And what the father could not do, if he were alive, his personal representative cannot do, now that *778 he is dead. To my mind, it is a ease which calls loudly for the relief of a court of equity.
Believing that the first special plea of the defendant in the court below, substantially presents the ground of this defence; and that it is authorized by Sec. 5, Chap.. 172, of the Code of 1860,1 am of opinion that the court erred in rejecting the plea.
The .special plea of non est factum is very in artificially drawn, and I am inclined to think that the special facts-as therein set out, do not justify the conclusion that the said writing was not the defendant’s deed. But it is by no means clear that the plea of non est factum would not be a good plea upon the facts as now fully disclosed in the first special plea. In Ward & al. v. Churn. 18 Gratt. 801, the court held that if the instrument was delivered to the obligee upon a condition, and the condition was known to the obligee, then the obligor is entitled to insist on said condition, and the obligee, if said condition has not been fulfilled, is not entitled to recover on the bond. In that case one of the obligors named in the bond had not subscribed his name; and a scroll was annexed to which no name was signed. But such indications of incompleteness in the instrument are only circumstances from which an inference may be drawn, that the instrument was delivered to the obligee, only upon condition: not equal in force to direct and positive evidence that it was so delivered. J. Joynes, in delivering-the opinion of the court, said: “ When the instrument is delivered directly to the obligee, the delivery cannot be regarded as conditional in respect to the party who makes it; unless the condition is made known to the obligee.” (p. 813.) And he cites Hudson v. Revett, 5 Bing. R. 368, (15 Eng. C. L. R. 467), in which O. J. Best characterized the old rule that a deed could not be delivered as an escrow to the grantee and obligee as a mere *779 technical subtlety; and quotes Comyn as good authority, and as saying: “ If it be delivered to the party as an escrow, to be his deed on the performance of a condition, it is not his deed until the condition is performed, though the party happen to have it before the condition is performed.” He also quotes J. Cabell in Hicks v. Goode, 12 Leigh 479, that the position that where the deed is delivered to the donee, it is not competent for the obligor to show that it was delivered as an escrow, or upon condition, rests on technical and unsatisfactory grounds. J. Joynes himself characterizes it as “strict and technical to the last degree;” and quotes from Preston in his edition to the Touchstone, to show that he did not regard it as the law in his day.
But it is unnecessry, and would protract this opinion, already too long, to say more on this point. I think it is clear from the record, that the plaintiff in error, has not had a fair trial of his case upon its merits, and that flagrant injustice has been done him by the judgment of the court below. Hpon the whole, I am of opinion to reverse the judgment, and to remand the cause, &c.
Monguee P. and Staples and Bouldin, Js. concurred in the opinion of Christian, J.
Judgment affirmed,